IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CYNTHIA J. JARMAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil No. 13-cv-959-CJP[1] |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Cynthia J. Jarman seeks judicial review of the final agency decision denying her application for Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for benefits in July, 2010, alleging disability beginning on May 18, 2010. (Tr. 8). After holding an evidentiary hearing, ALJ William L. Hafer denied the application for benefits in a decision dated May 3, 2012. (Tr. 8-16). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

## Issues Raised by Plaintiff

---

[1] This case was referred to the undersigned for final disposition on consent of the parties, pursuant to 28 U.S.C. §636(c).  See, Doc. 12.

1

Plaintiff filed a Motion for Summary Judgment at Doc. 16. She raises the following points:

1. The ALJ erred in failing to include all medical records from plaintiff's prior applications in the current case file.

2. The case should be remanded because the doctor who performed the consultative physical exam was under investigation for professional misconduct.

3. The ALJ erred in not giving greater weight to the opinion of Dr. Andrea Miller.

4. The ALJ did not include all limitations established by the record in his hypothetical question to the vocational expert.

### **Applicable Legal Standards**

To qualify for SSI, a claimant must be disabled within the meaning of the applicable statutes.[2] For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C.

---

[2] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

2

§423(d)(3).  "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit.  20 C.F.R. §§ 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled.  20 C.F.R. §§ 404.1520.  Under this procedure, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.  *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether Ms. Jarman was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)).

The Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In reviewing for substantial evidence, the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

### **The Decision of the ALJ**

ALJ Hafer followed the five-step analytical framework described above. He noted that a prior application for benefits had been denied on May 18, 2010, the current alleged date of onset. He determined that plaintiff had not worked since the application date. He found that plaintiff had severe impairments of lumbago,

4

hypertension, chronic obstructive pulmonary disease, and obesity. He further determined that her impairments did not meet or equal a listed impairment.

The ALJ found that Ms. Jarman's allegations about her impairments and limitations were not credible. He determined that she had the residual functional capacity (RFC) to perform work at the light exertional level, with some physical limitations. She had no past relevant work. Based on the testimony of a vocational expert, the ALJ found that plaintiff was not disabled because she was able to do jobs which exist in significant numbers in the local economy.

### The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff and is confined to the relevant time period.

**1.   Agency Forms**

Plaintiff was born in 1966, and was 44 years old on the alleged onset date of May 18, 2010. (Tr. 153).

In a report filed in support of the current application, plaintiff said she stopped working because of her condition on June 1, 1997. She said she was unable to work because of heart problems, osteoporosis, numbness in hands, breathing difficulties, restless leg syndrome, arthritis in her legs, back and fingers, and anxiety. (Tr. 157).

Ms. Jarman filed a Function Report in December, 2010, stating that she did very little throughout the day. She tried to do housework and laundry, but she had

5

to take a lot of breaks. She slept a lot. She was tired all the time and had no energy. She said her legs were swollen all the time, and she had pain in her back and down both legs. She had to urinate often. She had numbness in her fingers, hands and toes. Her fingers were swollen and she knots in her fingers from arthritis. Her "nerves" bothered her and she did not like to be around a lot of people. She alleged difficulty with activities such as walking, standing, sitting, and using her hands. (Tr. 207-215).

### 2.   **Evidentiary Hearing**

Ms. Jarman was represented by an attorney at the evidentiary hearing on January 6, 2012. (Tr. 23).

She lived with her husband, who was on disability. She went to school through the ninth grade. She was able to read, add and subtract. She was 4' 9" tall, and weighed 184 pounds. (Tr. 26-27).

Ms. Jarman had not worked in the past 15 years. She was in a car accident in 1996. She testified that she did not work between about 1998 and 2006 because she "didn't want to work then." About 6 years prior to the hearing, she developed a pinched nerve in her back, arthritis in her fingers and fluid build-up in her legs, which made her unable to work. (Tr. 27-29).

Her most severe pain was in her legs and fingers. She could sit for about 30 minutes at a time, and could stand for 20 to 30 minutes. Standing and walking caused pain in her legs. She did not use a cane. She also had numbness in her fingers and toes, and "knots" on her knuckles. She had not been able to see a specialist or have testing because she did not have health insurance. (Tr. 29-32).

6

She smoked cigarettes. She cut down to almost a pack a day about 6 months before the hearing. She had been spending about $170.00 per month on cigarettes. At the time of the hearing she was spending about $115.00 per month. (Tr. 33-34).

Plaintiff had to use the restroom 3 times during the hearing. She said this was something that "happens all the time" and was caused by the Lasix that she took. (Tr. 37, 45).

Ms. Jarman testified that she had anxiety and depression. She did not receive any counseling or treatment other than medication. She did not have insurance for treatment. She had not tried to find a provider that would charge her based on ability to pay. (Tr. 38).

A vocational expert (VE) also testified. The ALJ asked him a hypothetical question which corresponded to the ultimate RFC assessment, that is, to assume a person of plaintiff's age and education with no past relevant work, who could do work at the light exertional level, limited to only occasional stooping, kneeling, crouching, crawling and climbing of stairs, no climbing of ladders, ropes or scaffolds, and no work at unprotected heights. The VE testified that this person would be able to do jobs which exist in the local economy, such as hand packer, packaging filling machine operator and cleaner. (Tr. 47-48). If she were also limited to only occasional handling, fingering and feeling, she would be unable to do these light, unskilled jobs. If she were required to elevate her legs for 25% of the day, she would be unable to do even sedentary work. (Tr. 49).

The ALJ acknowledged that, if Dr. Miller's opinion (Ex. C-10F) were

accepted, the "sedentary occupational base" would be eroded.   (Tr. 48).

### 3.     Medical Treatment

Ms. Jarman's prior application was denied in May, 2010.  That denial "stands as the final decision on her disability through the date of the decision. . . ." *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007).   The Court thus focuses on medical evidence close to and after that date, while recognizing that earlier evidence may be considered to the extent that it is relevant to plaintiff's condition during the time period in issue.   See, *Groves v. Apfel*, 148 F.3d 809, 810-811(7th Cir. 1998).

Ms. Jarman underwent a Functional Capacity Evaluation on March 9, 2010, at Southern Illinois Healthcare.   This evaluation was ordered by Dr. Miller.   The conclusion was that she was within the light physical demand level, but she had difficulty with standing, material handling tasks and prolonged walking secondary to being deconditioned and pain in the neck, legs and back.   (Tr. 245-252).

The medical records consist largely of office notes from Dr. Andrea Miller, plaintiff's primary care physician.   Between the prior denial (May 18, 2010) and the ALJ's decision on the current application (May 3, 2012), Dr. Miller saw plaintiff a total of 9 times.

In June, 2010, Dr. Miller noted that she was seeing plaintiff for follow-up of chronic conditions of anxiety, COPD, GERD, hypertension and neuropathy-multiply sites.  She was taking a number of medications, including Zantac, Lasix and generic Flexeril.   On exam, Dr. Miller detected paresthesia in the right and left toes and tenderness over the lumbosacral spine and in the hips and knees.   She had no swelling in her legs.  (Tr. 260-263).   Exams in August and

October, 2010, yielded similar results.   (Tr. 281-283, 325-328).

Dr. Adrien Feinerman performed a consultative physical examination on November 1, 2010.  Ms. Jarman presented with multiple complaints, including numbness in her fingers and toes, pain in her back and legs, frequent urination, rapid heartbeat, arthritis in her fingers and shortness of breath.   She said she was able to perform gross manipulations normally, but sometimes had problems with fine manipulations due to numbness and stiffness in her fingers.   She also complained of anxiety and depression.   Dr. Feinerman reported that her physical exam was normal.   She had a full range of motion of the spine, hips, shoulders, elbows, wrists, knees and ankles.   There was no swelling.   Her lungs were clear with no wheezes, rales or rhonchi.   Her grip strength was strong and equal. Muscle strength was normal throughout.   Ambulation was normal.   Fine and gross manipulation were normal.   She had no difficulty with standing on toes and heels, squatting and arising, or tandem walking.   Sensory exam was normal to vibration, light touch and pinwheel.   Dr. Feinerman concluded that she was able to sit, stand, and walk normally, as well as lift, carry and handle objects without difficulty.   (Tr. 284-295).

In December, 2010, Ms. Jarman told Dr. Miller that the numbness in her arms was getting worse.   She had a "hard time describing the numbness, states she can feel touch, not tingly, but numb."   Physical exam was normal except for paresthesia in the hands and toes on both feet, tenderness over the spinal column and in the hips, knees and SI joints.   She also had tenderness over the ankles and calves.   (Tr. 325-328).

9

On March 15, 2011, the physical exam was the same. Dr. Miller started her on generic Celexa for arthritis and generic Neurontin for neuropathy. (Tr. 341-343). In May, 2011, plaintiff told Dr. Miller that the numbness and tingling in her hands and legs was slowly getting better. She had no side effects from her medications. (Tr. 344). Dr. Miller noted that she would like to get nerve conduction testing done, but "payment source is a concern." As her symptoms were improving, the doctor elected to "monitor." (Tr. 346).

The record contains notes of only two more visits with Dr. Miller. On June 1, 2011, Ms. Jarman was seen for a breast exam. (Tr. 348-350). On the last visit, in July, 2011, plaintiff told Dr. Miller she had been having increasing low back pain for the past week. She described the pain as shooting and radiating into her abdomen. On exam, she had generalized right lower quadrant and suprapubic tenderness. Dr. Miller prescribed acetaminophen with codeine for 10 days and a Toradol (nonsteroidal anti-inflammatory) injection. She also ordered an ultrasound scan of the pelvis. (Tr. 351-353).

4.   **Opinion of Treating Doctor**

Dr. Miller filled out a form entitled Medical Assessment of Physical Residual Functional Capacity on November 18, 2011. There is no indication of whether she had seen plaintiff since the last documented visit in July, 2011. She indicated that plaintiff could lift less than 10 pounds and could use her hands and arms for simple grasping and for operating arm controls for less than 1/3 of the day. She could "rarely" perform fine finger manipulation. She did not need to elevate her feet or legs. Her postural movements were limited. She could sit for a total of 6

hours a day and stand/walk for a total of 2 hours a day. She would be likely to miss 3 or more days a month due to medical or psychological problems. (Tr. 354).

### Analysis

The Court first notes that plaintiff has not challenged the ALJ's credibility determination. To the extent that her arguments rely on her own subjective statements, they are undermined by the adverse credibility determination.

Plaintiff first argues that the ALJ erred in not including all of the medical records related to her prior application in the current case file, in violation of the requirements of the agency's HALLEX (Hearings, Appeals and Litigation Law) Manual.

There are several problems with plaintiff's argument. First, contrary to plaintiff's suggestion, HALLEX does not require that all of the exhibits from a prior file be included as exhibits in a later claim file. Rather, "the ALJ must associate the prior *ALJ decision* with the current claim(s) file." HALLEX, §I-2-6-58(B), emphasis added. However, the ALJ is only required to include the old exhibits in certain circumstances, none of which are present here. HALLEX, §I-2-1-13. In general, the ALJ is only required to include evidence that is material, and material evidence is defined as evidence that is "relevant, i.e., involves or is directly related to issues being adjudicated." HALLEX, §I-2-6-58(A). ALJ Hafer made it plain that he was not reopening the prior denial and that the current claim concerns only the period of time subsequent to the prior denial. (Tr. 8). Therefore, the old exhibits would not be relevant. Further, plaintiff cites no authority for the proposition that the HALLEX Manual creates legally enforceable rights. In fact, the Seventh Circuit

11

has explicitly declined to decide whether the HALLEX Manual "creates rights that litigants can enforce in court." *Dean v. Colvin*, 585 Fed. Appx. 904, 905 (7th Cir. 2014). It is worth noting that the Supreme Court has held that the agency's Claims Manual "has no legal force" because it not a regulation. *Schweiker v. Hansen*, 101 S. Ct. 1468, 1471 (1981). HALLEX is not a regulation either, and, in the absence of any contrary authority, this Court declines to find that it creates legally enforceable rights. And, in any event, plaintiff does not explain how she was prejudiced by the failure to include the old exhibits in the current claim file.

Plaintiff's second point is also a nonstarter. Citing to "the internet" (Doc. 16, p. 7, n.8), plaintiff alleges that Dr. Feinerman was placed on probation in 2009 and was reprimanded in 2010 by the Illinois Division of Professional Regulation. She argues that these circumstances demonstrate that Dr. Feinerman has "a character flaw" and was distracted at the time he examined plaintiff. Again, she offers no authority for the proposition that these circumstances require remand.

20 C.F.R. §404.1503a provides that the agency will not use a doctor whose license has been revoked, suspended or surrendered to perform consultative examinations. However, there is no suggestion that Dr. Feinerman's license was revoked, suspended or surrendered at the time he examined Ms. Jarman, or since then. The point is denied.

Plaintiff argues that the ALJ should have given controlling weight to Dr. Miller's opinion. The ALJ gave the opinion "little weight" because it was not supported by her treatment notes. The ALJ pointed out that Dr. Miller's notes indicated that plaintiff was doing well and had no signs of joint disease. He

12

explained that Dr. Miller's notes do not support her opinion that plaintiff's ability to handle, finger and reach are seriously limited. He contrasted Dr. Miller's opinion with Dr. Feinerman's normal exam, including his findings that plaintiff had a full range of motion and no signs of joint disease. Dr. Feinerman found that plaintiff was able to perform both fine and gross manipulations normally. See, Tr. 13-14.

The opinions of treating doctors are to be evaluated under 20 C.F.R. §404.1527. Obviously, the ALJ is not required to accept a treating doctor's opinion; "while the treating physician's opinion is important, it is not the final word on a claimant's disability." *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996)(internal citation omitted). If is the function of the ALJ to weigh the medical evidence, applying the factors set forth in §404.1527. Supportability and consistency are two important factors to be considered in weighing medical opinions. See, 20 C.F.R. §404.1527(d). In a nutshell, "[t]he regulations state that an ALJ must give a treating physician's opinion controlling weight if two conditions are met: (1) the opinion is supported by 'medically acceptable clinical and laboratory diagnostic techniques[,]' and (2) it is 'not inconsistent' with substantial evidence in the record." *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010), citing §404.1527(d).

The ALJ must be mindful that the treating doctor has the advantage of having spent more time with the plaintiff but, at the same time, she may "bend over backwards" to help a patient obtain benefits. *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006). See also, *Stephens v. Heckler*, 766 F.2d 284, 289 (7th Cir. 1985) ("The patient's regular physician may want to do a favor for a friend and

13

client, and so the treating physician may too quickly find disability.").

When considered against this backdrop, the Court finds no error in the ALJ's weighing of the doctors' opinions. An ALJ can properly give less weight to a treating doctor's medical opinion if it is inconsistent with the opinion of another physician, internally inconsistent, or inconsistent with other evidence in the record. *Henke v. Astrue*, 498 Fed.Appx. 636, 639 (7th Cir. 2012); *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007). Further, in light of the deferential standard of judicial review, the ALJ is required only to "minimally articulate" his reasons for accepting or rejecting evidence, a standard which the Seventh Circuit has characterized as "lax." *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008); *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008). Here, the ALJ relied on the fact that Dr. Miller's treatment notes did not support her opinion, and her opinion was inconsistent with Dr. Feinerman's findings. The Court finds that ALJ Hafer more than met the minimal articulation standard here.

Lastly, plaintiff argues that the ALJ did not include all of her restrictions in his hypothetical question to the VE. She first references the fact that plaintiff took 3 bathroom breaks during the hearing. However, she points to no medical evidence that plaintiff suffered from frequent need to urinate. Dr. Miller's notes contain no such complaint, and, in May, 2011, Dr. Miller noted that plaintiff had no side effects from her medications. (Tr. 344). An ALJ "must include all limitations supported by medical evidence in the record." *Simila v. Astrue*, 573 F.3d 503, 521 (7th Cir. 2009). Because a limitation arising out of a frequent need to urinate was not supported by the record, the ALJ did not err in failing to include

14

it in the hypothetical.

Plaintiff also makes a confused argument that the ALJ made a "finding that she cannot do sedentary work due to her hand problems. . ." (Doc. 16, p. 10-11). This argument is based on an incorrect reading of statements made by the ALJ at the evidentiary hearing.  The ALJ acknowledged that *if* he were to accept Dr. Miller's opinion, he would find that the occupational base of sedentary work was eroded.  See, Tr. 48.  However, he did not accept Dr. Miller's opinion.  He did not, as suggested by plaintiff, "rely" on Dr. Miller's opinion for his hypothetical question or make a finding that plaintiff is not capable of sedentary work due to hand problems.

In sum, none of plaintiff's arguments are persuasive.  Even if reasonable minds could differ as to whether Ms. Jarman was disabled at the relevant time, the ALJ's decision must be affirmed if it is supported by substantial evidence, and the Court cannot make its own credibility determination or substitute its judgment for that of the ALJ in reviewing for substantial evidence.   *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012); *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

## Conclusion

After careful review of the record as a whole, the Court is convinced that ALJ Hafer committed no errors of law, and that his findings are supported by substantial evidence.   Accordingly, the final decision of the Commissioner of Social Security denying Cynthia J. Jarman's application for disability benefits is **AFFIRMED**.

Plaintiff's Motion for Summary Judgment **(Doc. 16)** is **DENIED**.

The clerk of court shall enter judgment in favor of defendant.

**IT IS SO ORDERED.**

**DATE:   January 15, 2015.**


<u>**s/ Clifford J. Proud**</u>
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**

16